581 So.2d 810 (1991)
Christine DUREN
v.
NORTHWESTERN NATIONAL LIFE INSURANCE COMPANY.
89-944.
Supreme Court of Alabama.
May 17, 1991.
*811 Bryan G. Duhé, Mobile, for appellant.
Sandy Grisham Robinson of Coale, Helmsing, Lyons, Sims & Leach, Mobile, for appellee.
ALMON, Justice.
Christine Duren, as beneficiary of a life insurance policy on her deceased husband, Dale Duren, filed an action in tort and in contract against the insurer, Northwestern National Life Insurance Company. Northwestern defended on the grounds that its denial of benefits and return of premiums were proper because, it claimed, Mr. Duren had misrepresented material facts in applying for the policy. After discovery, including depositions of Mr. Duren's treating physicians, the trial court entered a summary judgment for Northwestern.
Mr. Duren applied for the policy on March 25, 1986; he died of lung cancer on June 15, 1987. On the application, he disclosed that he had been treated for pneumonia in May 1985 by Dr. Dietze at Thomas Hospital in Fairhope and listed his regular physician as Dr. Neil Wimberley[1] of Mobile, whom he said he had last consulted on February 17, 1986, for a "check-up." In answers to other questions on the form, he denied that he had ever had any disease of the lungs, any heart or chest pains, or cancer, and denied that he was "presently under [his] doctor's care for any condition." He answered "no" to the question, "Have you in the past 12 months had any known or suspected heart attack, stroke, or cancer, other than of the skin, or been treated by any physician or other practitioner for any of these conditions?"
Because Mr. Duren was over 50 years old, Northwestern required a paramedical examination, which was performed on April 2. The report of that examination includes the following notations:
"1.a. Name and address of your personal physician? Dr. F.H. Dietze, Fairhope.
b. Date and reason last consulted? May 1985 PneumoniaHospitalized.
c. What treatment was given or medication prescribed? Antibiotics by IV Stayed in hospital 2 days.
"....
"3. Are you now under observation [this word was circled in ink] or taking treatment? Yes. Go to Dr. Neal Wimberly[2] Diagnostic CenterDauphin Street for chest X-rays re pneumonia.
"....

*812 "[5.]d. Have you within the past 5 years had electrocardiograms, X-rays, [or] other diagnostic tests? Yes. Had tests while in hospitalsee 1B above. CAT scan at Dr. Wimberly['s] office in Sept. 1985see 3 above."
Northwestern did not contact either Dr. Dietze or Dr. Wimberley for more information on, or for verification of, Mr. Duren's treatment for pneumonia. On April 16, 1986, it issued a policy at a smoker's rate, because his examination showed the presence of nicotine in his urine. Mr. Duren complained that, as shown in his application, he had quit smoking a year earlier, but said that he was chewing nicotine gum. Northwestern reissued the policy effective August 4, 1986, at a nonsmoker's rate and sent him a form entitled "Change in Application and Statement of Continued Insurability Status by Applicant." Part A of that form amended his answer to the question "Have you used tobacco in any other form in the last 12 months?" to read, "No, chews nicorette gum." Part B included the statement "I have not been ill or injured and my health and physical condition [have] not changed since the date I made the said application." He signed this form on August 28, 1986. On June 6, 1986, Dr. Wimberley had definitively diagnosed Mr. Duren as having lung cancer and had started him on radiation therapy.
The claim was made within the contestability period of the policy, and Northwestern conducted an investigation. In its letter denying coverage, Northwestern informed Mrs. Duren of the following:
"[R]ecords recently made available to Northwestern National Life Insurance Company conflict with the statements made on [Mr. Duren's] application and paramedical examination. Specifically, we have learned that:
"[Mr. Duren] was referred to Dr. Mark Barnard for pulmonary function tests in June of 1985 and again saw Dr. Barnard at Thomas Hospital on September 4, 1985 when tomograms were done which revealed a fracture of the rib and a soft tissue abnormality along the chest wall. At this time the possibility of malignancy and options of performing thoracotomy or rib biopsy were discussed.
"... [H]e was diagnosed with a right upper lobe abnormality, fractured right posterior rib and bullous emphysema by Dr. Neal Wimberley on September 20, 1985. At this time Dr. Wimberley discussed with him the possibility of malignancy.
"It is also noted Dale Duren signed a Statement of Continued Insurability on August 28, 1986 indicating there had been no change in his health since the date of the application. Medical records in our possession reveal in fact there were significant changes."
The evidence developed during discovery tended to support these assertions. Although it is unclear exactly what Mr. Duren's doctors had told him before he made the initial application, it is clear that he knew his lung condition involved more than pneumonia. In May 1985, Dr. Dietze had told him that he had a chronic lung condition over and above his acute condition of pneumonia. Dr. Wimberley stated that Mr. Duren had complained of severe chest pain prior to March 1986. Mr. Duren did not mention having seen Dr. Barnard, Dr. Percy Howard, or Dr. Robert McGinley. Certainly, by the time he stated in August that there had been no change in his health, he knew that he had cancer.
In Bankers Life & Casualty Co. v. Long, 345 So.2d 1321 (Ala.1977), the Court affirmed a judgment for the beneficiary over the insurer's argument that the deceased insured had misrepresented material facts in his application and that, therefore, it was entitled to void the policy. The insured had disclosed that he had been treated for hepatitis for six months in 1966, had given his doctor's name and address, and had stated that he was in good health and free from disease. In fact, he had also been treated for cirrhosis of the liver, and he died of that ailment. The Court cited the rule that "an intentional misrepresentation by the applicant of material facts relied on by the insurer permits the insurer to avoid the policy," but also cited the *813 exception that "the policy is not avoided if the insurer knows the true facts, or the falsity of the statements, or has sufficient indications that would put a prudent person on notice so as to induce an inquiry which, if done with reasonable thoroughness, would reveal the truth." 345 So.2d at 1323 (citations omitted).
The Court held that, because his liver had been tested as functioning normally, "Long had every right to believe that his liver disease was under control and thus the jury had ample evidence before it to conclude that he was not guilty of fraud in completing the application." Id. The Court also held that "there was sufficient notice that he had suffered from, and was treated for, a liver disease, to put the insurer on sufficient notice to impose a duty of inquiry." Id.
Bankers Life was decided under Ala. Code 1940, tit. 28, § 6, which allowed a misrepresentation to void a policy only if "made with actual intent to deceive" or if "the matter misrepresented increase[d] the risk of loss." Effective January 1, 1982, that section was replaced by what is now Ala.Code 1975, § 27-14-7, which reads, in pertinent part:
"(a) ... Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract unless either:
"(1) Fraudulent;
"(2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or
"(3) The insurer in good faith would either not have issued the policy or contract, or would not have issued a policy or contract at the premium rate as applied for, or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise."
This Court construed that language in National Savings Life Ins. Co. v. Dutton, 419 So.2d 1357 (Ala.1982), and held that a new trial was required on Dutton's contract claim because the trial court had erroneously instructed the jury that the insurer could not void the policy if Dutton "was truthful in her answer ... to the best of her knowledge." This Court quoted § 27-14-7 and said:
"It was unnecessary, therefore, for plaintiff to have provided incorrect information with an intent to deceive. If she innocently made an incorrect statement that was material to acceptance of the risk, or would have caused National, in good faith, not to have issued the policy as it did, then National could have denied her claim and voided her policy."
419 So.2d at 1361.
Mrs. Duren's arguments that her husband did not know the true nature of his disease at the time he filed the original application[3] are therefore beside the point at issue here. Northwestern was entitled to void the policy if Mr. Duren made even an innocent misrepresentation of the kind specified in § 27-14-7, unless the principle of Bankers Life is still operative and is applicable to the evidence in this case so as to create a genuine issue of material fact precluding Northwestern from being entitled to a judgment as a matter of law. Rule 56(c), Ala.R.Civ.P.
The change from the language of Code 1940, tit. 28, § 6, as applied in Bankers Life, to the language of Code 1975, § 27-14-7, may have broadened the types of misrepresentation that could prevent a recovery under the contract, but it did not touch on the question before us, that is, whether an insurer may be prevented from voiding a policy based on a misrepresentation otherwise applicable under § 27-14-7 *814 if the application put the insurer on notice of facts material to the applicant's true medical condition and it conducted no inquiries to verify those facts. Thus, the amendment to the statute did not effectively overrule Bankers Life.
Northwestern contends that Inglish v. United Services Gen'l Life Co., 394 So.2d 960 (Ala.Civ.App.1980), cert. denied, 394 So.2d 967 (Ala.1981), establishes that the holding of Bankers Life is no longer the law. If the two cases are inconsistent, the opinion of this Court would govern over the opinion of the Court of Civil Appeals. Moreover, this Court denied certiorari with an express reminder that "[b]y denying the petition, we should not be understood as agreeing with the treatment of the evidentiary issue in this case by the Court of Civil Appeals." Ex parte Inglish, 394 So.2d 967 (Ala.1981). Finally, we do not view the two cases as inconsistent: Inglish cites Bankers Life in holding that
"the jury could have concluded that a reasonable insurance company would not have been put on notice that Gordon Inglish's answer to question 28 of his application was false or misleading and that, therefore, appellee was under no obligation to examine decedent's medical records before issuing a policy of insurance on his life."
394 So.2d at 966. Thus, the two cases recognize that an application containing sufficient indications to put an insurer on notice of an applicant's health problems or false answers might preclude the insurer from rescinding its contract if it disregarded that notice and did not make reasonable inquiries to confirm or refute those indications, and that the question of what constitutes "sufficient indications" for this purpose is ordinarily one for the trier of fact.
Nor is Old Southern Life Ins. Co. v. Spann, 472 So.2d 987 (Ala.1985), inconsistent with Bankers Life. Spann told the soliciting agents about some of her medical treatments, and she asserted that they agreed to contact her physicians regarding the exact nature of her abdominal surgeries. She did not mention her prior psychiatric treatment, but this Court agreed with her position that an issue was presented on whether the application was ambiguous regarding disclosure of psychiatric treatment. The Court held that, although jury questions were presented on her contract and fraud claims, Old Southern was entitled to a directed verdict on the bad faith claim.
The Court's opinion includes the following:
"It is undisputed that Mrs. Spann did not mention her psychiatric treatment. An insurer has a right to expect applicants for insurance policies to tell the truth. Old Southern has at least an arguable position that the application requested information that would include her psychiatric treatment. Mrs. Spann certainly knew of this treatment and she did not reveal it. An insurance company does not normally have a duty to inquire further to verify that an applicant has told it the truth. While Old Southern may have undertaken a duty in this case to make inquiries of her doctor, the failure to do so does not support a bad faith action in these circumstances. The psychiatric treatment is so different in kind from the surgeries, as to which the agents allegedly agreed to ascertain the specific nature, that Old Southern is entitled to raise her failure to mention it as a defense."
472 So.2d at 989-90 (emphasis added).
Although Northwestern contends that the emphasized statements are inconsistent with Bankers Life, we do not construe them as being so, for three reasons. First, the statements regarded the bad faith claim, which requires that the insurer have no arguable defense to the contract claim, and the defense of misrepresentation on the application is ordinarily arguable even if the insurer has some notice of the truth. Second, if they are read as saying that an insurer has an unqualified right to rely on statements in an application, they are inconsistent with the holding that the contract claim presented triable issues. Third, they were made in regard to the complete failure to mention the psychiatric treatment, *815 and, thus, there was no question of notice sufficient to provoke further inquiry.
Similarly, the applicant's complete failure to disclose her history of mental illness provided a defense on the contract and raised no question of notice in Hess v. Liberty National Life Ins. Co., 522 So.2d 270 (Ala.1988). The Court impliedly recognized that a fact question on notice could be presented, but held that Hess's contention that Liberty National was estopped to deny the claim because its agent had notice of her mental illness was not supported by the evidence submitted in opposition to the summary judgment motion. Also, in Reserve Life Ins. Co. v. Haster, 500 So.2d 1052 (Ala.1986), and Richerzhagen v. National Home Life Assur. Co. of New York, 523 So.2d 344 (Ala.1988), judgments for the insurance companies were affirmed where the applicants had completely failed to disclose significant medical history.
The fact that the principle of Bankers Life is still the law is apparent, however, from such cases as Reliance Ins. Co. v. Substation Products Corp., 404 So.2d 598 (Ala.1981), in which the Court cited Bankers Life for its exception to the general rule that misrepresentations on an application allow an insurer to void a policy. The Court phrased the exception thusly:
"The policy is not avoided if the insurer knows the facts, or the falsity of the statements, or has sufficient indications that would put a prudent person on notice so as to induce an inquiry which, if done with reasonable thoroughness, would reveal the truth."
404 So.2d at 604. The Court held that Reliance's agent "had sufficient indications so as to induce further inquiry, and, therefore, [to] fall within the exception to the general rule." Id.
American Gen. Life & Acc. Ins. Co. v. Lyles, 540 So.2d 696 (Ala.1988), is similar to Spann, supra, in that the Court reversed the judgment because of the denial of a directed verdict motion on the bad faith count. The Court listed several issues of fact that would be present on a retrial of the contract claim, including "whether American General was presented with information that would have prompted a reasonably prudent insurer to investigate the application further." Id., at 699. The Court said: "While the information available to American General may have imposed upon it the duty to investigate the application further, its failure to do so does not preclude it from raising as a defense [to the bad faith claim] Mr. Lyles's failure to mention the 1981 hospitalization." Id.
In Taylor v. Golden Rule Ins. Co., 544 So.2d 932 (Ala.1989), the Court affirmed a judgment rescinding the contract in a case tried without a jury. Taylor's argument was that the insurance company, by relying on a pre-existing condition to deny a claim, had waived the right to void the policy based on misrepresentations in the application of which it arguably had learned by the time it denied the claim. Cf. Old Southern Life Ins. Co. v. Woodall, 295 Ala. 235, 326 So.2d 726 (1976). The Court in Taylor observed that "the point at which Golden Rule learned of Taylor's history of mental disturbance was a disputed fact at the ore tenus hearing, and the trial court resolved that issue in Golden Rule's favor." 544 So.2d at 936. The Court distinguished Bankers Life on the grounds that Taylor had provided no information about his mental condition on four proof-of-loss forms and had "withheld the information called for on the application in response to a specific question on the subject." Id. The Court concluded:
"The record reveals no evidence or indication that Golden Rule knew or should have known of Taylor's past treatment and hospitalizations for a nervous condition prior to its January 7, 1986 letter to him [confirming, after an investigation of his medical records, its earlier denial based on pre-existing condition] that would render the trial court's finding on that issue clearly erroneous or palpably wrong."
Id.
Thus, the cases have consistently held that where an insurance company has no knowledge or indications of a condition concealed by a misrepresentation in an application, it is entitled to void the policy, but *816 where it knows the facts, knows the falsity of the statements on the application, or has "sufficient indications that would put a prudent person on notice so as to induce an inquiry which, if done with reasonable thoroughness, would reveal the truth," a question of fact is presented as to whether the insurer is entitled to void the policy. Reliance Ins. Co., supra, 404 So.2d at 604; Bankers Life, supra, 345 So.2d at 1323.
Mr. Duren clearly made misrepresentations that would ordinarily support avoidance of the policy. Having held that Bankers Life has not been overruled by the statutory amendment that is now § 27-14-7 or by cases such as Spann and Hess, we must determine whether the summary judgment was proper on the grounds that Northwestern did not have indications of a condition concealed by those misrepresentations sufficient to impose on it a duty to inquire further into Duren's medical history before issuance of the policy.
Because many of the pertinent facts are set out at the beginning of this opinion, we shall simply cite those which allegedly put Northwestern on notice of Mr. Duren's true condition. He stated in March 1986 that he had been hospitalized in May 1985 for pneumonia. In April 1986 he told the paramedical examiner that he was still under observation by Dr. Wimberley for pneumonia, that Dr. Wimberley had taken chest X-rays as part of that observation, and that he had had a CAT scan for that condition in September 1985. These facts cannot be said to be "sufficient indications" that he had cancer so as to constitute such notice as would prompt a prudent insurer to conduct further inquiries. Thus, even under the rule of Bankers Life and the other cases discussed herein, Northwestern was entitled to a summary judgment on this record. The judgment is therefore affirmed.
AFFIRMED.
SHORES, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.
MADDOX, J., concurs in part and dissents in part.
HORNSBY, C.J., and ADAMS, J., dissent.
MADDOX, Justice (concurring in part; dissenting in part).
After reviewing the evidence presented, I believe that summary judgment was appropriate on the tort claim. Therefore, I concur in that portion of the opinion that affirms the granting of summary judgment on the tort claim. However, I believe summary judgment was not appropriate on the contract claim.
The insurer required a paramedical examination as a pre-condition to issuing a policy of insurance; the insurer was told that the insured had been hospitalized with a lung condition, and was under the care of a pulmonary expert. Based on these facts, a fact finder could conclude that the insurer should be estopped to claim that it had the right to rely upon the insured's statements made in the application and that it had no duty to investigate further. I think that a properly instructed jury should determine the reasonable expectancies of the parties in this case.
HORNSBY, Chief Justice (dissenting):
I must respectfully dissent. Although I concur with the statements of law in the majority's opinion, I cannot agree that the law stated in that opinion requires an affirmance of the summary judgment in this case. The opinion correctly recognizes that Ala.Code 1975, § 27-14-7, does not overrule the principle expressed in Bankers Life & Casualty Co. v. Long, 345 So.2d 1321 (Ala.1977), that an insurer may not avoid a policy on the grounds of a misrepresentation by the applicant where the insurer "knows the true facts, or the falsity of the statements, or has sufficient indication that would put a prudent person on notice so as to induce an inquiry which, if done with reasonable thoroughness, would reveal the truth." Id. at 1323.
The central issue becomes whether the determination that Northwestern had a duty of inquiry or did not have such a duty *817 should be resolved by the court or by the jury. Here the basic facts are that Duren discussed the advisability of replacing a life insurance policy he had with insurance agent Harry Snitkin when both men were present at a social occasion. On March 25, 1986, a few weeks after that conversation, Snitkin made a presentation to Duren and persuaded him to purchase a more cost effective policy issued by Northwestern. Snitkin understood that the primary purpose for the policy was to provide adequate funds for the payment of the debt secured by a mortgage on Duren's house in the event of his death. Duren further informed Snitkin that once the Northwestern policy was issued, Duren would cease premium payments on his earlier policy.
On the initial application, Duren indicated that he had been hospitalized in May 1985 for pneumonia, and that he was still under medical observation for that condition at the time he made the application, which was 11 months later. That program of observation included chest X-rays performed at various times and a CAT scan performed approximately four months after the initial hospitalization. Duren listed Drs. Wimberley and Dietze as involved in his treatment.
Upon his receipt of the policy, Snitkin notified Duren that the policy was in force from the date of the application, March 25, 1986, but that Snitkin was returning it for an adjustment in the premium to reflect a nonsmoker's rate. When Northwestern failed to respond after about two months, Snitkin contacted Northwestern directly and found that the underwriter who had handled the application was no longer employed at Northwestern and that the policy with the adjusted premium had not been issued. After discussing the situation with Northwestern, Snitkin received the policy with the change in premium in July.
Snitkin stated in his deposition that he had understood that the original policy was being corrected and mailed back. Snitkin also stated that in his subsequent meeting with Duren, Snitkin treated this "new" policy as a correction of the original. Snitkin stated that he and Duren discussed only the change in the premium made to reflect the nonsmoker's rate. Snitkin further stated that he did not review the other paragraphs in the corrected policy with Duren because he understood the corrected policy to address only the change to a nonsmoker's rate and not any other provision.
Snitkin's recollections and testimony with respect to the corrected policy are best reflected in his letter of September 30, 1987, to Northwestern:
"The policy date of the original policy seems to be the issue here. The new policy date was based on medical information and the original policy date of March 25, 1986. Had the policy been issued correctly upon the request for making the changes and handled properly, we would not be dealing with this problem today. We would be, in fact, dealing with the fact that Mr. Duren died on June 15, 1987 and there would be a need to examine for pre-existing conditions based on an application date of March 25, 1986 and a policy date of March 25, 1986. I'm in a very awkward position in that I brought back a policy with a different date of issue, had an amendment form signed, which I understood had to do with chewing `nicorette' gum, and it now appears that the Northwestern National is going to deal with that policy date instead of the original policy. I understand now that Mr. Duren did, in fact, see a doctor during that period of time and was advised that he had a change in his health status. Had I known it, at the time, of course, we would have kept the original policy date even with the standard issue instead of the non-smoker. It would definitely have been to his advantage to do so."
These facts support a number of inferences: (1) since Duren was already insured at the time of Snitkin's sales presentation, Duren did not misrepresent any aspect of his health in order to obtain insurance; (2) the information on the initial application supports an inference to a reasonably prudent life insurer that Mr. Duren was suffering from a chronic lung condition; (3) Duren had been a smoker in the past; (4) *818 investigation of Duren's medical records at the time of the application would have revealed the possibility of cancer but would not have revealed a positive diagnosis to that effect; and (5) both the agent, Snitkin, and Duren treated the corrected policy for a change in premium as being a modification to an extant policy where additional medical information was no longer relevant.
I note that some of these inferences support the plaintiff's argument that any misrepresentations by Duren were innocent. However, I agree with the majority opinion that the innocence of the misrepresentations is not crucial to our analysis. The crucial question is whether the initial application, including the subsequent paramedical examination, revealed enough indications of disease to impose on Northwestern a duty of inquiry. I would hold that the question of whether there were sufficient indications in these disclosures to impose on Northwestern a duty of inquiry is a question of fact, and that the responsibility for answering that question lies with the jury.
Although this Court has not directly addressed the issue of whether summary judgment on an insurer's duty of inquiry is appropriate under similar facts, our law does offer an analogy with respect to the general duty to discover the basis for a cause of action. The law in Alabama has long been that "[t]he question of when a party discovered or should have discovered fraud which would toll the statute of limitations is for the jury." Thompson v. National Health Ins. Co., 549 So.2d 12, 14 (Ala.1989) (quoting Vandegrift v. Lagrone, 477 So.2d 292, 295 (Ala.1985)); Hickox v. Stover, 551 So.2d 259 (Ala.1989). In short, the determination of when one has sufficient indications to impose a duty of inquiry as to the truth of a representation, whether in regard to a fraud action or in regard to an insurance application, is a determination to be made by the jury. Summary judgment would be appropriate in this case only if the plaintiff had failed to present sufficient evidence of facts that would have imposed a duty of inquiry on Northwestern.
In applying our standard for review of a summary judgment, I note that this action was filed after June 11, 1987. Therefore, Ala.Code 1975, § 12-21-12 (1975) mandates that the plaintiff meet her burden of proof by "substantial evidence." Bass v. South-Trust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Under the substantial evidence test, the nonmovant must present "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). More simply stated, "[a]n issue is genuine if reasonable persons could disagree." Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 481 (1982).
I also note that all reasonable doubts concerning the existence of a genuine issue of material fact must be resolved against Northwestern. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala.1990). Here, the initial application indicates that Duren had had lung problems for at least 11 months prior to the application and that he was still under observation for lung problems at the time of the application. The application also indicates various X-ray tests, a CAT scan, and hospitalization for pneumonia. The subsequent paramedical test indicated at least that Duren was or had been a smoker. Based on the testimony of Duren's doctors, I would conclude that an investigation by Northwestern would have revealed at least a tissue abnormality in the lung and that lung cancer was a possibility.
I would hold that these facts are substantial evidence to support a finding that Northwestern had a duty of inquiry. In light of the disclosure indicating the duration and extent of Duren's lung condition, I would answer "yes" to the question whether reasonable persons might conclude that Northwestern had a duty to further inquire into Duren's lung condition. Accordingly, I would hold that the trial court improperly entered the summary judgment in this *819 case, reverse that judgment, and remand the cause for further proceedings.
ADAMS, J., concurs.
NOTES
[1] This doctor's name is also spelled "Neal Wimberly" at some points in the record.
[2] The report appears to indicate that Mr. Duren said, "I go to Dr. Wimberley for observation," not that he suggested that the paramedic or other agents of Northwestern should go to Dr. Wimberley for further information.
[3] She also argues that his failure to mention it on the "Change in Application and Statement of Continued Insurability" is not grounds for voiding the policy because, she says, the specific purpose for which that form was sent was for Mr. Duren to record his use of the nicorette gum. This argument relates again to whether he intentionally failed to disclose more accurate information and does not raise an issue materially different from that treated in the text of the opinion.